NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In the matter of | : | Case No. 04-39249/JHW |
| Darren J. Bailiff | : | |
| Debtor | : | |
| _____ | : | |
| Janice Bailiff | : | Adversary No. 04-3131 |
| Plaintiff | : | |
| v. | : | |
| | : | **OPINION** |
| Darren J. Bailiff | : | |
| | : | |
| Defendant | : | |
| _____ | : | |

APPEARANCES:   Jenifer G. Fowler, Esq.
Sinko & Eisner
76 E. Euclid Avenue
Haddonfield, New Jersey  08033
Counsel for Plaintiff

Terry Glen Tucker, Esq.
92 West Broad Street
Bridgeton, New Jersey  08302
Counsel for Debtor

**FILED**

JAMES J. WALDRON, CLERK

January 31, 2006

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY:  Terry O'Brien, Jud. Asst. to
Chief Judge Wizmur

The plaintiff seeks here a determination that the mortgage payments the debtor was required to make pursuant to a property settlement agreement, executed in conjunction with a judgment of divorce, constitute "support" for purposes of 11 U.S.C. § 523(a)(5) and are therefore nondischargeable in this

bankruptcy proceeding.  She also seeks reimbursement for a tax debt collected by the IRS from her for a delinquency in the parties' 2000 joint tax return, occasioned by the debtor's failure to report certain income, and attorneys' fees incurred in connection with the divorce proceedings.  Alternatively, the plaintiff contends that both the mortgage payments and the tax liability are nondischargeable obligations pursuant to section 523(a)(15).

The debtor relies on the language of the property settlement agreement, which characterizes the mortgage payments as equitable distribution, and expressly provides that neither party will seek child support.  He also maintains that he has had primary custody of his two children since September 2000 and has been primarily responsible for their support.  By his agreement to make mortgage payments, he did not intend those payments to be in the nature of support.  Finally, he contends that his obligation to make the mortgage payments ended when the property was sold, and that the mortgage payment obligation should now be dischargeable.

For the reasons expressed below, I conclude that the plaintiff's claim with regard to the mortgage payments may not be characterized as support. With regard to the nondischargeability of plaintiff's claims under section 523(a)(15), I conclude that the claims may be discharged.

## FACTS

Janice and Darren Bailiff were married on October 19, 1985.  They had two children, Amanda Marie born on March 10, 1989 and Justin Michael born on September 5, 1991.  In November 1995, they purchased their principal residence, located at 119 Albany Avenue, Barrington, New Jersey, for $84,150.  A mortgage on the property was given to the Bank of America.[1]  On October 31, 1997, the parties added a home equity loan in the principal amount of $39,377.20 through Freddie Mac.[2]

The parties separated in September 1999.  At the time, Janice was receiving unemployment compensation, and Darren was employed full time.  Darren moved out of the family home and into a one bedroom apartment in Lindenwold.  He continued to pay both mortgages on the Barrington home.  Janice remained in the family home with the children.  Darren had the children over the weekend.  Janice began to work full-time sometime in 2000.  Later in 2000, Darren was injured during the course of his employment, and collected workers compensation benefits until March 2003.

---

[1]   The mortgage was assigned to New Jersey Housing and Mortgage Finance Agency on January 4, 1996, and then transferred to the Aurora Financial Group, Inc.

[2]   UMLICVP, LLC is listed as the record mortgagee.

In May 2000, Darren moved from Lindenwold to a larger residence in Gloucester City.  The parties differ somewhat in their description of the custody arrangements for the children between May 2000 and December 2003, when the Barrington home was sold.  Janice recalls that the children stayed with her from Friday night through Tuesday morning, except for two Saturdays a month when she was working,  T19-12 through 16 (9/13/05), and that the children were with Mr. Bailiff from Tuesday through Friday.[3]   Mr. Bailiff recalls that, beginning with the school year in 2000, he had the children five to six days each week, depending on Ms. Bailiff's work schedule.  T55-11 to 14.  He testified that the change in the children's living arrangements occurred gradually:

> It sort of just happened.  Due to her work schedule and my injury it was convenient for me to be able to watch the children while she went to work full time.  So we kind of came to a mutual agreement that I would take the kids with me full time being that I had the time with them and I was home.

T58-3 to 7.

---

[3]    The plaintiff offered the testimony of her sister Susan Gregorovic, who testified that for the month of February 2003, while she was staying with her sister in Barrington, the children stayed with their mother every week from Friday after school until Tuesday morning, when they went to school.  T13-4 through 14 (9/13/05).  The debtor contends that the testimony of Ms. Gregorovic was mistaken, although he recalls that "[o]nce in a while she (Janice) had them on Monday but not too often.  The majority of the time they were with me."  T61-3 to 4.  Although both Janice and Darren recalled that Janice worked two Saturdays each month, and did not have the children until Saturday afternoon on those weekends, Ms. Gregorovic did not recall her sister's schedule in that regard.  Id. at T56-7.

The exact number of hours spend by the children in each household need not be resolved here.  I am able to find that after the debtor moved to a larger residence in May 2000, and particularly after Janice began working full-time and Darren sustained a work-related injury in November 2000, the children gradually began to spend more time with him, although they continued to see their mother on a regular basis as well.

On November 11, 2002, the parties executed a Property Settlement Agreement.  The Agreement provides in relevant part:

> <u>Mutual Waiver of Alimony and Support</u>.  Each party hereby agrees to waive any right to alimony.  . . .
> . . .
> Husband and Wife further represent that the combination of their earning capacities, and the income and assets that each has received as a result of the equitable distribution provisions of this Agreement, are sufficient to permit them to enjoy a lifestyle, reasonably comparable to the lifestyle achieved during the parties' marriage.

Exh. P-2, Property Settlement Agreement, Art. I at 2.

> <u>Custody, Support and Maintenance of Children</u>.
>
> The parties shall share joint legal custody of the two minor children of the marriage . . .. [N]either party shall be designated as parent of primary residence.  The parties agree that the parties shall share an equal amount of parenting time with the children . . . in view of the shared parenting arrangement, neither party shall seek contribution for child support payments, one from the other.

<u>Id</u>. at Art. II at 3.

<u>Equitable Distribution of Property</u>.

. . . Husband and Wife agree that Wife shall be permitted to remain and reside in [the marital property] until such time as the minor child of the marriage, Justin Bailiff, graduates from high school. Upon Justin's graduation from high school Husband agrees to waive all right, title, interest and claim by equitable distribution or otherwise, to this property and shall transfer sole title and ownership of said property to Wife by execution and delivery of a Bargain and Sale Deed with Covenants Against Grantors Act.

Additionally, the parties agree that until such time as the minor child, Justin Bailiff, graduates from high school, Husband shall be solely responsible for the payment of both the first mortgage as well as the home equity loan in the approximate amount of $1,300.00 per month for this property. Husband agrees to indemnify and hold Wife harmless for any loss, including counsel fees that she may suffer as a result of his default upon the mortgage and the home equity loan. Husband further agrees that in the event of his filing for bankruptcy relief, he will not discharge the mortgage and/or home equity loan.

<u>Id</u>. at Art. III at 5.

<u>Filing of Tax Returns</u>.

The parties agree as follows in respect to any Federal and State Income Tax Returns heretofore jointly filed by them for any tax year. If there shall be a deficiency assessment with respect to any such joint tax return, the amount ultimately determined to be due thereon, including penalties and interest, shall be paid by the party whose income tax is attributable or by the party who failed to reveal said income or the party against whom any deduction taken is disallowed.

<u>Id</u>. at Art. IX at 12-13.

At the time the property settlement agreement was entered into in

November 2002, Janice was working full time as a dental assistant earning $12

or $13 an hour, and Darren was receiving workers' compensation benefits of about $555 per week.

The agreement was drafted by Ms. Bailiff's attorney, although Ms. Bailiff claims that the debtor "pretty much stated to [her] that that's the way that he wanted things as far as the mortgage and I agreed to that." T25-4 to 5. She explained that the children lived with her and that her ex-husband wanted them to continue to be able to stay with her and in the same school with their friends. T23-6 through 16. At the time of the property settlement, she could not afford to stay in the home without assistance. T20-20 through 21-23. She testified that "I was happy to have him pay the mortgage because I know that I wasn't going to be able to pay it." T25-19 to 21, and she considered the payments to be child support because "[i]t was a home for my children so that they could remain in the home." T26-2 to 3.

In contrast, Darren testified that at the time the property settlement agreement was entered into in November 2002, the children were mostly with him. The purpose of his agreement to pay the two mortgages on the house was to insure that the children could retain the Barrington address and could thereby continue to attend Barrington schools. Darren contends that he did not intend the mortgage payments to be in lieu of child support, particularly

-7-

because the children resided mostly with him at the time, and he was fully

supporting them.[4]

The parties' divorce was reduced to final judgment on February 13, 2003,

incorporating the provisions of the November 11, 2002 Property Settlement

Agreement.  Exh. P-1.  By the time the final judgment of divorce was entered,

the debtor had defaulted on the two mortgages.  On the same date that the

judgment of divorce was entered, February 13, 2003, Darren filed a voluntary

petition for relief under Chapter 13 of the Bankruptcy Code, case number 03-

14727/JHW.  In his Chapter 13 plan, he proposed to pay an IRS delinquency

claim and the mortgage arrears on the two mortgages.  Because his workers'

compensation benefits terminated in March 2003, and he had no income until

February 2004, he defaulted on his plan payments, and his case was dismissed

---

[4]   The debtor testified that "Mrs. Bailiff and I agreed that there would be no
child support because I was paying for the first and second mortgages on the
house.  At that time I was making a good income so I had agreed that I would
pay the first and second mortgages."  T60-7 to 11.  The debtor's testimony
suggests that the payment of the two mortgages was intended in lieu of child
support.  However, the debtor appears to have been testifying about his initial
agreement to make the mortgage payments in 1999, when he first left the
Barrington house and had only a small apartment in Lindenwold, with
inadequate space for the two children.  He characterized the payment to the
mortgage obligations as being made in lieu of child support when he was
"making a good income", which was before November 2000, when he sustained
a work-related injury.  For the two years preceding the property settlement
agreement, he was not working, and was receiving only workers compensation
benefits.

on June 30, 2003.  In July 2003, both mortgagees issued Notices of Intention to Foreclose.

The pending foreclosures caused the parties to decide to sell the house. The debtor signed over to his ex-wife his permission to sell the property and allow her to retain "[a]ll monies earned from the sale of the property."  Exh. P-6.  On or about December 15, 2003, the Barrington property was sold for $115,239.99.  After costs and settlement charges, Janice received nothing from the sale of the property.  Following the sale of the property, Janice moved in with her brother in Millville, New Jersey, and still resides there.  The children have been residing with Darren full time, except for weekend visitation with their mother.  For the duration of the 2003-04 school year, the children commuted to Barrington from Gloucester to attend school.  They lived in Gloucester until August 2004 when Darren, his girlfriend and the children moved back to Barrington into a rental home.

Nine months after the sale of the property, on September 9, 2004, Darren filed a second bankruptcy petition, this time a no-asset Chapter 7 case.  Janice responded with this adversary complaint filed against the debtor on December 13, 2004.  Janice contends that the debtor's failure to continue making the mortgage payments caused her to lose $1,331.95 per month (the mortgage

payment amount) in support from February 2003 through the date of the complaint, for a total amount lost of $30,634.85. She maintains that the debtor's actions also caused her to lose the appreciation in the value of the property that was sold. She contends that the mortgage payments constitute "support" for purposes of section 523(a)(5). Alternatively, she contends that the payments qualify as a nondischargeable debt under section 523(a)(15).

The plaintiff also seeks reimbursement for certain tax payments withheld by the IRS to satisfy the delinquency caused by the debtor in underreporting his unemployment compensation on the parties' 2000 joint tax return. Although the parties were separated at the time, they filed a joint return for the tax year ending December 31, 2000. Darren Bailiff apparently failed to report his unemployment compensation benefits received during 2000 in the amount of $10,906.00. As a result, the New Jersey Division of Taxation withheld $302.54 from Janice's 2001 New Jersey Saver Rebate. The IRS also withheld $3,126.00 from her 2003 tax refund to satisfy the delinquency. See Exh. P-8, 10, 11.

On July 12, 2005, the debtor moved for summary judgment. His motion was denied on August 15, 2005, and trial in this matter was held on September 13, 2005.

## DISCUSSION

The plaintiff seeks here a determination from the court recognizing that she holds:  (1) a claim for support that would be nondischargeable under section 523(a)(5), (2) a claim for reimbursement of a tax obligation that would be nondischargeable under section 523(a)(1), and/or (3) a claim covering both debts protected from discharge by section 523(a)(15).

I.    Section 523(a)(5)

Section 523(a)(5) of the Bankruptcy Code provides that:

(a)    A discharge under section 727, 1141, 1228(a),  1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
        ...

        (5)    to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

            (A)    such debt is assigned to another entity, voluntarily, by operation of law, or otherwise (other than debts assigned pursuant to section 402(a)(26) of the Social Security Act, or any such debt which has been assigned to the Federal Government or to a State or any political subdivision of such State); or

-11-

> (B)      such debt includes a liability designated
> as alimony, maintenance, or support, unless such
> liability is actually in the nature of alimony,
> maintenance, or support;

11 U.S.C. § 523(a)(5).

The issue of "[w]hat constitutes alimony, maintenance, or support, will be determined under bankruptcy laws not State law."  S. Rep. No. 989, 95th Cong., 2d Sess. 79 (1978); HR Rep. No. 595, 95th Cong., 1st Sess. 364 (1977). See also In re Gianakas, 917 F.2d 759, 762 (3d Cir. 1990).  The statute provides no guidelines or formulas for distinguishing between claims for support and claims based on other types of matrimonial debt.

To properly characterize an obligation, the intent of the parties at the time of the settlement agreement must be discerned.  In re Gianakas, 917 F.2d 759, 762 (3d Cir. 1990).  Courts "'must look beyond the label attached to an obligation by a settlement agreement to examine its true nature.'"  In re Cegan, 153 Fed. Appx. 73, 75 (3d Cir. 2005) (quoting In re Gianakas, 917 F.2d at 762). In Gianakas, to find the intent of the parties, the Third Circuit examined three principal indicators:  (1) the language and substance of the agreement in the context of the surrounding circumstances; (2) the financial circumstances of the parties at the time of the agreement; and (3) the function served by the

-12-

obligation at the time of the divorce or settlement.  917 F.2d 759, 762-63.  See

also In re Dickson, 126 Fed.Appx. 52, 54 (3d Cir. 2005); In re Sanabria, 275

B.R. 204, 207 (Bankr. D.N.J. 2002).  Under Gianakas, the court's inquiry is

limited to the nature of the obligation at the time it was undertaken.[5]  The

burden is on the party who objects to the discharge of the debt to show that

the debt was in the nature of support.  Cegan, 153 Fed. Appx. at 75.


Here, as to the first indicator of the parties' intent, the agreement clearly

identified the debtor's obligation to make the monthly mortgage payment as

equitable distribution.  The agreement, which was drafted by Janice's attorney,

specified that in light of the "shared parenting arrangement, neither party shall

seek contribution for child support payments, one from the other."[6]  As well,

each party agreed to waive any right of alimony.[7]


As to the second indicator of the parties' intent, the financial

circumstances of the parties at the time of the agreement, in November 2002,

---

[5]  The court refrained from inquiring into the parties' present need for
alimony and support because it "would put federal courts in the position of
modifying matrimonial decrees of state courts, thus interfering with the
delicate state systems for dealing with the dissolution of marriages.'" 917 F.2d
at 763 (quoting Forsdick v. Turgeon, 812 F.2d 801, 803-04 (2d Cir. 1987)).

[6]  Exh. P-2, Property Settlement Agreement, at Art. II at 3.

[7]  Id. at Art. I at 2.

Janice was working full time as a dental assistant earning approximately $12
to $13 an hour, or about $22,000 per year.  The debtor had been injured on
the job two years earlier, and was receiving workers' compensation benefits at
the rate of $555 per week.  The debtor was living in a rented home in
Gloucester, New Jersey, with his girlfriend, who was also working and
contributing to the household income.  Custody arrangements were shared
between Janice and Darren, although Darren had more time to spend with the
children because he was not employed, and attended to the children during the
week.

       The third indicator of the parties' intent, the function served by the
obligation at the time of the agreement, is most indicative of the intent of the
parties here.  At first blush, the obligation to make monthly mortgage
payments to a former spouse and children would seem to serve as continuing
support to maintain the shelter needs of the children,  Indeed, when the debtor
first undertook to make the mortgage payments when he left the marital
residence in September 1999, and moved to a one-bedroom apartment, there is
no doubt that he intended the payment of the monthly mortgages to be in the
nature of support to enable the children to remain in the home.  From the time
the parties separated in 1999, the debtor was determined to keep the children
in the Barrington school district to allow the children to continue their

education and their friendships without disruption.  Through the years, and up to the present, the debtor's determination to keep the children in the Barrington school system did not waiver.  However, after he moved, in May 2000, to a home in Gloucester, and the children spent more time there, the obligation he maintained to make monthly mortgage payments on the marital home was undertaken not to provide the children with shelter, which they had with him, but to insure that they could continue to attend the Barrington school system.  By the time the property settlement agreement was entered into, for the most part, the children were spending their weekdays with the debtor.  He transported the children to school and to their activities in Barrington several times a day.  After the sale of the Barrington house in December 2003, the children, who were now living with the debtor full time, were able to stay in the Barrington schools for the remainder of the school year without a Barrington address.  According to the plaintiff, the debtor offered to pay the plaintiff a monthly stipend if she would find a place to live in Barrington "because the kids were going to be starting school again.  He wanted them to stay in their school."  T31-18 to 19.  In August 2004, the debtor moved his household to Barrington, renting a house there, to enable his children to finish their education in Barrington.

As noted above, at the time of separation in 1999, the debtor agreed to

continue paying the mortgages on the Barrington residence to allow his

children to remain in the family home and to permit them to continue to attend

school uninterrupted by the parties' separation.  Mrs. Bailiff was unemployed

at the time.  There is no question that without the debtor's financial assistance,

Janice could not have remained in the home with her children, even after she

became employed as a dental assistant.  She testified that:

> He (Darren) said that he wanted the children to stay in their home.
> It was support because he knew that I wasn't going to be able to
> afford to stay there.  I had no income at the time.  He wanted them
> to go to school there and stay with their friends.  That was their
> home where they had grown up since they were little.

T19-4 through 9.  Later, in an e-mail dated March 1, 2003, written shortly after

the property settlement agreement was entered into, the debtor acknowledged

that his financial assistance was necessary for Janice to stay in the Barrington

home.  See Exh. P-12 ("because if it wasn't for me you would be living and

paying for something somewhere else on your own than I would take full

custody of the kids cause you could not provide a proper place for them to live

or afford them").  I understand the debtor's e-mail to mean that the

maintenance of mortgage payments by the debtor afforded Janice the

opportunity to maintain another home for the children when they were with

her on the weekends.  The contents of the e-mail do not establish that the

mortgage payments were necessary for the support of the children.

-16-

Whether the parties intended the mortgage payments to be in the nature of support is informed by "the function served by the entire obligation . . . [and whether it] supports the conclusion that it was intended as maintenance and support." Cegan, 153 Fed. Appx. at 76.  "An obligation that serves to maintain daily necessities such as food, housing and transportation is indicative of a debt intended to be in the nature of support." In re Gianakas, 917 F.2d at 763. While mortgage payments would ordinarily serve to maintain the daily necessity of housing, the housing needs of the children were met by the debtor's living arrangements at the time of the agreement.  The mortgage payments were being made by the debtor to retain a Barrington address for the children.

On this record, I conclude that the plaintiff has failed to meet her burden to establish that the mortgage payments were intended as support for the children of the marriage, and therefore nondischargeable under section 523(a)(5).

II.     Section 523(a)(1)

The plaintiff next seeks reimbursement from the debtor for the amounts that she paid toward his tax debt.  She contends that if the debtor owed money

to the IRS at the time he filed for bankruptcy, the debt would have been

nondischargeable under 11 U.S.C. § 523(a)(1).  The plaintiff asserts that

because she paid the debtor's IRS debt, she should stand in the shoes of the

IRS to have the debt due to her declared nondischargeable under section

523(a)(1).  The plaintiff's quest in this regard must be denied.[8]


Under section 523(a)(1), tax debts due to a taxing authority at the time a

bankruptcy petition is filed, are nondischargeable if they are:

> (A) of the kind and for the periods specified in section 507(a)(2) or
> 507(a)(8) of this title, whether or not a claim for such tax was filed
> or allowed;
>
> (B) with respect to which a return, if required--
>
>> (I) was not filed; or
>>
>> (ii) was filed after the date on which such return was
>> last due, under applicable law or under any extension,
>> and after two years before the date of the filing of the
>> petition; or
>
> (C) with respect to which the debtor made a fraudulent return or
> willfully attempted in any manner to evade or defeat such tax.

---

[8]   The claim under § 523(a)(1) was never pled in the original adversary
complaint.  It was first raised in counsel's pretrial memorandum.  Even
assuming that the plaintiff was to properly plead section 523(a)(1), the plaintiff
would not succeed in being substituted for the IRS for purposes of establishing
the nondischargeability of the plaintiff's claim.

-18-

11 U.S.C. § 523(a)(1).

The plaintiff cannot stand in the shoes of the IRS.  At the time of the

debtor's filing, the tax debt was no longer due.  The IRS had no claim against

the debtor.  The principle of equitable subrogation places the person who paid

the claim against the debtor in the position of the creditor whom they paid.

U.S. v. Avila, 88 F.3d 229, 238 (3d Cir. 1996).   Janice Bailiff has a claim

against the debtor for the taxes that she paid on his behalf.  She does not hold

a tax claim against the debtor, which would be nondischargeable under section

523(a)(1).


III.    Section 523(a)(15)


Section 523(a)(15) affords increased protection for non-debtor spouses

and provides:

> (a)    A discharge under section 727, 1141, 1228(a),  1228(b), or
> 1328(b) of this title does not discharge an individual debtor from
> any debt—
>
>        . . .
>
> (15)    not of the kind described in paragraph (5) that is
> incurred by the debtor in the course of a divorce or separation or
> in connection with a separation agreement, divorce decree or other
> order of a court of record, a determination made in accordance
> with State or territorial law by a governmental unit unless-

> (A)     the debtor does not have the ability to pay
> such debt from income or property of the debtor not
> reasonably necessary to be expended for the
> maintenance or support of the debtor or a dependent
> of the debtor and, if the debtor is engaged in a
> business, for the payment of expenditures necessary
> for the continuation, preservation, and operation of
> such business; or
>
> (B)     discharging such debt would result in a
> benefit to the debtor that outweighs the detrimental
> consequences to a spouse, former spouse, or child of
> the debtor.

11 U.S.C. § 523(a)(15).

Under section 523(a)(15), a debtor is not discharged from any marital

debt that is not in the nature of alimony, maintenance or support unless:  (1)

the debtor is unable to pay the debt, or (2) the benefit to the debtor of

discharging the debt would outweigh the detriment to the debtor's former

spouse.  11 U.S.C. § 523(a)(15).  While in general, the burden of proof is on the

objecting creditor, once the creditor has shown that the debt in question

constitutes a property settlement award for purposes of section 523(a)(15), the

majority of courts have concluded that the burden shifts to the debtor to prove

that either of the exceptions to nondischargeability apply.  See, e.g., In re

Moeder, 220 B.R. 52 (8th Cir. BAP 1998); In re Jodoin, 209 B.R. 132, 139 (9th

Cir. BAP 1997); In re Sanabria, 275 B.R. 204, 207-08 (Bankr. D.N.J. 2002).

-20-

At the hearing, the debtor sought to establish that the benefit to him of discharging the debt would outweigh the detriment to the plaintiff.   Some courts utilize a balancing test of eleven (11) non-exclusive factors to balance the benefit to the debtor against the detriment to the creditor.  They include: (1) the amount of the debt and the payment terms; (2) the current incomes of all parties' and their spouses; (3) the current expenses of all parties' and their spouses; (4) all parties' and spouses' current assets; (5) all parties' and spouses' current liabilities; (6) the parties' and spouses' health, job training, education, age, and job skills; (7) consideration of the dependents and their ages and special needs; (8) any relevant changes in financial conditions since the divorce; (9) the amount of the debt to be discharged; (10) the status of any objecting creditor; and (11) whether the filing and the challenge under section 523(a)(15) were in good faith.  In re Smither, 194 B.R. 102, 111 (Bankr. W.D.Ken. 1996).   See also In re Armstrong, 205 B.R. 386, 392 (Bankr. W.D.Tenn. 1996).

The plaintiff currently makes $15.00 an hour and works approximately 35 hours per week resulting in gross pay of $525.00 per week.  T40-41.  Her net income is approximately $700.00 every two weeks.  T48-15.  The plaintiff pays her brother $300.00 a month toward household expenses.  T15-11.  She also buys groceries for the house.  She testified that groceries typically cost

about $75.00 a week.  T49-15 to 18.  Her car payment is $332.00 per month,

T49-1, and her car insurance is $154.00 per month.  T49-6.  She also pays

$186.00 per month to maintain furnishings and personal belongings from the

Barrington home in storage.  T49-10 to 12.  Given her present income, she

cannot afford to rent her own apartment.  Except for occasional purchases for

the children, she is not able to contribute to the support of the children.

The debtor currently makes $700.00 a week in gross salary and brings

home $568.00 a week.  He pays $1,150.00 a month in rent and $280.00 a

month for a car payment.  He also pays all of the expenses related to the

children, including medical coverage, although the specific breakdown of these

numbers was not provided at trial.  See T73-T74.  His girlfriend also

contributes to help pay the household expenses.  In his Chapter 7 petition filed

on September 9, 2004, the debtor listed his net monthly income as $2,080.00,

and his monthly expenses as $3,001.00.[9]

In balancing the benefit to the debtor and the detriment to the plaintiff in

these circumstances, the most significant factor presented is the consideration

_____

[9]   The debtor's testimony at trial indicates that his net monthly income has
increased to approximately $2,442.00 ($568 x 4.3).  His expenses have also
increased.  Monthly rental payments have increased from $850.00 to
$1,150.00, and monthly car payments have increased from $117.00 to
$280.00.

of the needs of the parties' two children.  There is no dispute that the debtor is

now solely responsible for the support of the children, who are both teenagers.

Declaring the debt due to the plaintiff, in monthly mortgage payments missed,

lost appreciation of the marital residence, taxes paid by the plaintiff on the

debtor's behalf, and the plaintiff's attorney' fees, as nondischargeable would

cause serious hardship to the debtor and to the children of the parties, who

depend upon the debtor for support.  I am sympathetic to the plight of the

plaintiff in not being able to afford a place of her own at this point.  However, a

balancing of the benefits and detriments between the parties compels me to

conclude that the debts due to the plaintiff from the debtor may be discharged.


        Counsel for the defendant is directed to submit an order in conformance

with this opinion.


Dated:   January 31, 2006

_____
JUDITH H. WIZMUR
CHIEF JUDGE
U.S. BANKRUPTCY COURT

-23-